UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,          **REPORT AND RECOMMENDATION**

                         v.                        Criminal No. 7-CR-212(A)(M)

MALIK BAZZI, et al.,

                 Defendants.
_____

         This case has been assigned to me by Hon. Richard J. Arcara for supervision of pretrial proceedings [37].[1] Before me are the motions of defendants Ling Zhen Hu ("Hu") and Xiao Cheng Lin ("Lin") to suppress evidence seized during a search of their apartment on September 12 and 13, 2007 [225, 247].[2]

         An evidentiary hearing was held on August 13, 21 and September 14, 2009 [463, 464, 523], at which ICE Special Agent ("SA") Brian Hurwitz and New York State Police investigator Michael Cameron testified on behalf of the government, and defendant Hu and her son, Jaiji Lin, testified on behalf of defendants. Thereafter, the parties filed post-hearing briefs [554, 567, 576].[3] For the following reasons, I recommend that the motions to suppress evidence be granted.

---

      [1]        Bracketed references are to CM-ECF docket entries.

      [2]        Defendants seek a variety of other dispositive and non-dispositive relief, which I address in a separate Report, Recommendation and Order [588].

      [3]        Defendant Lin joined in defendant Hu's initial suppression motion [225] and they also filed consolidated post-hearing briefs [554, 576].

**BACKGROUND**

On September 11, 2007, defendants Hu and Lin (along with several others) were named in an indictment charging them, *inter alia*, with conspiracy to traffic in counterfeit goods in violation of 18 U.S.C. §371 [1]. At approximately 6:00 a.m. on September 12, 2007, armed with arrest warrants for Hu and Lin (Gov't Ex. 1, 2), SA Hurwitz and approximately 8 other ICE agents, including investigator Cameron, arrived at 3802 149th Place in Flushing, New York to effectuate their arrest [507/52-53; 523/72-73].[4] SA Hurwitz had previously conducted surveillance on July 30, 2007, and had observed them leaving the premises in a van [507/8, 49-50]. A records check showed that defendant Hu owned the building, and that the couple resided in the second floor apartment [507/14, 64, 68].

According to the government witnesses, the agents did not believe this to be a high risk entry, and did not have their guns drawn [523/107-108]. Upon arrival, the agents noticed that the front screen door was closed, but that the interior door was open [507/12, 58]. There were vehicles in the driveway, including the same van as they observed on July 30 [507/64]. The agents concluded that defendants Lin and Hu were present at the premises from their observation of the van and their knowledge that they resided at the premises [507/67]. They rang the three doorbells and knocked on the door, but nobody came to the door [507/13, 58]. The screen door was unlocked, so they entered the common hall area Id. At that point, they heard a commotion above them [507/14, 69-70]. SA Hurwitz and some of the agents went to the second floor and knocked on the door Id. Other agents went to the third floor. Id.

---

[4] References are to docket number and page of the hearing transcript (*i.e*, docket #507, p. 52).

-2-

SA Hurwitz testified that he knocked on the door to the second floor apartment, and that defendant Hu opened the door and permitted the agents to enter [507/73, 87]. He claims that he identified himself and showed her his badge and the arrest warrant [507/15]. He noted that Hu matched the photograph which he had of her. Id. He claims that she allowed them into the foyer of the apartment. Id. Hu was taken to the living room and placed on the couch after it and the areas in immediate reach of the couch were searched [507/91-92]. She was also was also permitted to get dressed [507/99].

He testified that defendant Lin was discovered in hiding in the third floor apartment and was brought to the second floor apartment in handcuffs [507/15, 17; 523/78-79, 99], where he was advised that he was under arrest [507/17-18, 21; 523/116]. SA Hurwitz seized Lin's wallet and cell phone, but was did not know the source of his authority to do so [481/26-27]. He took Lin to the rear bedroom to get his clothes. [507/21]. Defendant Lin was then brought to the living room, where he joined Hu on the couch [507/21-22; 523/80]. According to SA Cameron, Lin was brought to the living room, rather than being removed from the apartment, in order to ascertain his identification [523/80]. Lin was provided with a Chinese interpreter to explain to him what was occurring and to request his consent to search the apartment [507/27].

The apartment consisted of a foyer with a kitchen, living room and bedroom off to the right and a closet and two bedrooms to the left [507/22; Gov't Ex. 3]. While SA Hurwitz at one point testified that he walked through the apartment "to conduct a security sweep to see how many other people were there, or if there were any dangers to the agents" [507/27], elsewhere he testified that he did *not* perform the security sweep personally [481/79], and that the security

-3-

sweep was performed by other agents [507/96-97]; *see also* government's brief [567], p. 7 ("fellow agents conducted a security sweep of the apartment while Hurwitz interacted with Hu in the foyer"). SA Hurwitz admitted that during his walk through the apartment he "looked around to see whatever [he] could see" [481/79], which included "documents, photographs, and evidence of counterfeiting and trafficking in counterfeit merchandise, both in the living room and in the kitchen" [507/27].

In the living room, SA Hurwitz observed a surveillance system, which was next to a large cash counting machine contained in a box, and a coffee table with photographs of sneakers located on it [507/33; Gov't Exs. 4-6]. He claimed that the photographs and cash counting machine were visible without having to move anything. Id. The front drawer of the coffee table was also opened because it was accessible to Lin and Hu, who were seated two or three feet away on the couch and not handcuffed [507/34]. Money was observed in the drawer of the coffee table [507/34-35; Gov't Ex. 7].

SA Hurwitz admitted that his "plain view search [lasted] an hour to two hours" [481/105], during which time he went throughout the entire apartment [481/79]. As a result of the search, a variety of items were seized from the apartment. From the living room, SA Hurwitz seized the photographs of sneakers from the coffee table, because "they appeared to be evidence of trafficking in counterfeit merchandise, specifically sneakers" [507/37]. However, he conceded that he was unable to discern from the photographs whether the sneakers were counterfeit [507/114]. He also seized the $1,800 (in $100 bills) contained in the drawer of the coffee table because he "thought it could be proceeds from the trafficking in counterfeit merchandise [507/39; Gov't Ex. 7], as well as the money counting machine because "it provided

evidence of possibly operating a cash business, large cash business " [507/38; Gov't Ex. 14]. However, he later conceded that money counting machines are not illegal [507/113].

In the kitchen, cash receipt books, leger books containing numbers and Chinese characters and photographs of sneakers with Chinese characters were visible on the kitchen table and on the floor adjacent to the table. These items were seized [507/40-44; Gov't Exs. 10-13], even though he was unable to read Chinese characters [507/125]. SA Hurwitz also admitted that he did not know what other commercial activities Hu was involved in during the prior four months of the investigation, but believed that the seized documents related to the sale of counterfeit sneakers "because of where they were found, and because of the totality of the circumstances" [481/10, 14].

SA Hurwitz admitted that possession of bank books and legers is not evidence of a crime, and that he did not know whether these materials would evidence a crime at the time they were seized [570/119-120]. In addition to financial records and photographs of sneakers, he seized insurance receipts, a pain clinic business card, printouts of homes for sale, a binder which had "property of Jiiaji Lin" written on the spine, and a phone book [507/120-121; 481/35, 44]. A composition book was also seized because "it was found in the vicinity of the other stuff, and it appears to be a ledger book that someone would write numbers in, or write - - keep track of a cash business" [507/129; 481/34]. He also seized a blue plastic bag with a snap cover without ever looking inside the bag merely because a home mortgage payment was located on it [507/127-128].

He testified that he seized stacks of papers if the top document appeared to be incriminating [570/120; 481/104]. Piles of documents were searched by viewing and seizing the

documents located on the top of the pile, which revealed underlying documents that were similarly viewed and seized [481/104]. He looked through the pages of some of the documents and inspected some of the items before seizing them, but did not inspect every piece of paper in the apartment [507/123; 481/29-30, 41].

SA Hurwitz did not decide to apply for a search warrant for the apartment until after defendant Lin refused to consent to the search of the premises [481/84]. Agents remained at the apartment until the following day to secure the premises [507/60; 523/101, 120]. On September 13, 2007, SA Hurwitz applied for and obtained a search warrant for the apartment from Magistrate Judge Marilyn Go of the Eastern District of New York [507/46; 523/118; Gov't Ex. 8]. Paragraph 19 of his affidavit in support of the application described what he had seen during the search of the premises on September 12, but nowhere in the affidavit did he disclose the fact that much of the evidence described in the affidavit had already been removed from the apartment (*see* Def't. Ex. A). The search of the apartment after the warrant issued on September 13, 2007 yielded $750,000 in cash and monetary instruments, photographs and records [507/47].

Defendants disputed the government's version of events in several respects. Defendant Hu testified that she awoke to a "big bang sound" and observed two police officers holding their guns at her [523/35]. She was handcuffed behind her back and taken to the hallway, where she remained for approximately one hour while agents searched the apartment and was never permitted to sit on the couch in the living room [523/35, 37, 59]. Defendants also presented testimony that the exterior metal screen door locked automatically when it was shut

and that it was found to be damaged following the events of September 12, 2007 [481/126, 130-131; 523/28, 38; Def't. Ex. I].

## ANALYSIS

I need not decide whether the government's or defendants' version of events is more accurate, because even if I credit the government's version, I conclude that the evidence must be suppressed. My "analysis begins . . . with the basic rule that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions". Arizona v. Gant, ___U.S. ___, 129 S.Ct. 1710, 1716 (2009); United States v. Miller, 430 F. 3d 93 (2d Cir. 2005), cert. denied, 547 U.S. 1206 (2006) ("a warrantless search of a home is presumptively unreasonable"). "The burden of showing that the search fell within one of the exceptions to the warrant requirement is on the government." United States v. Kiyuyung, 171 F. 3d 78, 83 (2d Cir. 1999).

In attempting to meet that burden, the government argues that "officers were entitled to enter the multi-apartment building upon reason to believe defendants were within", and that "upon arresting HU inside her apartment, agents were entitled to engage in a security sweep of the apartment, and [to] seize any items found in plain view". Government's brief [567], pp. 18, 26. In the alternative, it argues that "the subsequent issuance and execution of a search warrant for the defendants' apartment render harmless any conceivable Fourth Amendment violation claim". Id., p. 38. Each of these arguments will be addressed.

A.      Was There a Proper Basis to Enter the Premises?

"For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York 445 U.S. 573, 603 (1980). Defendants argue that "the government has made no showing that agents . . . had probable cause to believe that [defendants] were in the premises . . . at the time they went there to serve the warrant". Defendants' joint post-hearing memorandum [554], p.12.

However, "probable cause" is "too stringent a test . . . . The proper inquiry is whether there is a *reasonable belief* that the suspect resides at the place to be entered to execute an arrest warrant, and whether the officers have *reason to believe* that the suspect is present". United States v. Lauter, 57 F. 3d 212, 215 (2d Cir.1995) (emphasis added). "The 'reasonable belief' standard . . . may require less justification then the more familiar probable cause test." Id.

In this case, agents had confirmed that defendant Hu owned the building and that defendants resided on the second floor of the building. Moreover, they had observed defendants entering and leaving the building on at least one other occasion. Since the arrest occurred at 6:00 a.m., they had a reasonable basis to believe that defendants would be in the premises at that time. "The courts have recognized that once officers have a reason to believe that a suspect lives in a particular dwelling, they may reasonably infer that he will be home early in the morning . . . . In this case, the officers attempted to execute the arrest warrant around 6:00 a.m. Defendants could reasonably infer that Rowe should have been home at this hour." Tyson v. Willauer, 290 F. Supp. 2d 278, 285 (D.Conn. 2003). *See also* United States v. Terry, 702 F. 2d 299, 319 (2d

Cir.1983) ("the agents arrived at the apartment at 8:45 A.M. on a Sunday morning, a time when they could reasonably believe that Terry would be home").

**B.      Was the Seizure Justified Under the "Plain View" Doctrine?**

Under the "plain view" doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). Thus, in order to invoke this exception to the warrant requirement, the government must prove that the agents were properly in the location from which they observed the items, that the items were in fact visible from that location, and that their incriminating nature was immediately apparent. Therefore, each of these criteria must be examined.

**1.      Were the Agents "Lawfully in a Position" to View the Items?**

I must first consider whether the agents had a reason to be in those portions of the apartment from which the seized items were observed. According to SA Hurwitz, the agents met defendant Hu at the door to the apartment, and defendant Lin was brought down from the third floor to that same location. At that point, the agents "could, as a precautionary matter and without

probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. 325, 334 (1990).

However, that did not entitle them to look in other rooms of the apartment. Id. at 332-33 ("possessing an arrest warrant . . . the officers were entitled to enter and to search anywhere in the house in which [defendant] might be found.  Once he was found, however, the search for him was over, and there was no longer that particular justification for entering any rooms that had not yet been searched"). *See also* United States v. Ali, 2006 WL 929368, *4 (E.D.N.Y. 2006) ("there is no . . . justification . . . for routinely searching any room other than that in which an arrest occurs").

The right to conduct a search beyond the immediate area of arrest "is decidedly not automatic, but may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene." Buie, 494 U.S. at 336.  The government claims that "fellow agents conducted a security sweep of the apartment while Hurwitz interacted with Hu in the foyer . . . .  The purpose of the sweep was to see if there were other people present in the apartment who could pose a danger to the agents." Government's brief [567], p. 7.  However, these agents were not called to testify as to what caused them to believe that others might be present, and SA Hurwitz himself "had no idea . . . whether there were others still in the apartment of whom he had to be concerned, or whether the fugitive had attempted to procure a weapon". Government's brief [567], p. 30.

This fails to satisfy the government's burden of showing a "reasonable, articulable suspicion" of danger which would justifying a search of the entire apartment.  "Lack of information cannot provide an articulable basis upon which to justify a protective sweep." United States v. Gandia, 424 F. 3d 255, 264 (2d Cir. 2005); United States v. Moran Vargas, 376 F. 3d 112, 117 (2d Cir. 2004). For example, in United States v. Zubiate, 2009 WL 483199, *4

(E.D.N.Y. 2009), where the defendant was arrested at the threshold of the door to the apartment, the court held that there was no justification for a search of the entire apartment. "The critical question is whether, in expanding the scope of the security sweep to the entire second floor, the officers had articulable facts that supported an inference that the area to be swept harbored an individual posing a danger to those present . . . . The government failed to offer any such articulable facts. Anderson testified that the purpose of the sweep was to make sure there were, in fact, no other people inside . . . but neither he nor his brother agents articulated specific reasons for believing that a third party posing a threat was present upstairs. I suppose the officers might reasonably have believed [someone else] was inside the apartment, but given the absence of testimony to that effect it would be pure conjecture. Moreover, there was no testimony or information suggesting that anyone on the premises . . . posed a danger."

Similarly, in Gandia, the court held that "any concern that Gandia himself might be dangerous was fully and permissibly addressed by the officers by frisking Gandia, and by a search within his 'grab area,' *i.e.*, by looking behind the sink next to which Gandia was standing to assure that there were no firearms within Gandia's reach. The search of an adjoining room to which Gandia had no ready access was unnecessary for this purpose . . . . The government, moreover, has pointed to nothing in the record from which a reasonable police officer could have inferred that there was a specific danger of unknown third-parties hiding in Gandia's apartment." 424 F. 3d at 264.

*See also* Ali, 2006 WL 929368, as **4, 6 ("Hott's search of Ali's bedroom cannot be justified as a protective sweep . . . . the bedroom searched by Hott was not a space

immediately adjoining the office where [police] were questioning Ali . . . . The officers lacked any basis to believe that the bedroom harbored an individual posing a danger").

Since the government has not shown that the agents had a lawful reason to be in the living room or kitchen, where they allegedly observed the items which were subsequently seized, the search is illegal *even if* the items were in "plain view" from those vantage points. "If the scope of the search exceeds that permitted by the . . . character of the relevant exception from the warrant requirement, the search is unconstitutional without more." Horton v. California, 496 U.S. 128, 140 (1990).

### 2. Was the Incriminating Character of the Seized Items "Immediately Apparent"?

The second requirement of the "plain view" doctrine is that the incriminating nature of the items be "immediately apparent". Dickerson, supra. In this regard, it bears noting that a protective sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found", which "lasts no longer than is necessary to dispel the reasonable suspicion of danger." Buie, 494 U.S. at 335-36.

According to SA Hurwitz, the protective sweep by the other agents lasted a "couple minutes" [507/98], whereas his search - which led to the seizure of evidence - lasted one to two hours [481/105]! The only specific evidence mentioned by the agents as a result of their security sweep was that there was "some money" in the top drawer of the coffee table in the living room [507/98]. While admitting that the money "was not in plain view", the government argues that "police were nevertheless entitled to open and inspect the drawer of the table for

weapons, since . . . it was well within the grabbing area of the defendants as they waited (to get dressed) on the living room sofa". Government's brief [567], p. 37.

However, defendants were not in the living room when they were initially apprehended, and the government cannot justify the search by relocating the defendants to the living room. United States v. Perea, 986 F. 2d 633, 643 (2d Cir. 1993) ("Arresting agents are not allowed to simulate circumstances warranting application of the incident-to-arrest exception merely by bringing the item they wish to search into the area near the person arrested, or vice versa"). Moreover, SA Hurwitz's speculative belief that the money "*could* be proceeds of trafficking in counterfeit merchandise" (government's brief [567], p. 10 (emphasis added)) does not satisfy the requirement that its criminal nature be "immediately apparent", and there is no indication that its incriminating nature was "immediately apparent" to the other agents who conducted the initial sweep.

The government focuses on why SA Hurwitz decided to seize the evidence: "Hurwitz detailed the many reasons why *he* seized specific items observed in plain view in the defendants' apartment . . . . Hurwitz drew upon *his* experience and training . . . . Hurwitz testified that *he* recognized each of the items, and thereafter seized them, because *he* believed that the item was connected to trafficking in counterfeit sneakers". Government's brief [567], pp. 9, 36 (emphasis added). However, SA Hurwitz did not conduct the initial protective sweep, and the government has offered no evidence as to whether the criminal nature of the items would have been "immediately apparent" to those agents who did.

Moreover, SA Hurwitz admitted that, far from "happening" upon items in the course of a legitimate protective sweep of the apartment, he "looked around to see whatever [he]

could see" [481/79].  He was not constrained by whether evidence of criminality was "immediately apparent" - over the course of his one-to-two-hour search, he seized binders and entire stacks and bags of documents without looking at them, including documents written in Chinese - which he admitted he could not understand.

Such conduct is far from what is contemplated or allowed under the "plain view" exception to the warrant requirement.  If  "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object - *i.e.*, if its incriminating character is not immediately apparent, . . . the plain-view doctrine cannot justify its seizure." Dickerson, 508 U.S. at 375.  "Since there is no basis for concluding that the incriminating nature of these papers was immediately apparent, their seizure was not permissible under the plain view doctrine." United States v. Lopez, 1994 WL 649154, *3 (S.D.N.Y. 1994).

C.      **Would the Subsequent Search Warrant Inevitably Have Issued?**

In the alternative, the government argues that "to the extent the Court finds certain of the items seized in plain view should not have been immediately taken, the Court should still not suppress any evidence as all of those items and currency would have been inevitably and/or independently obtained through the power of the warrant" which it subsequently obtained. Government's brief [567], pp. 40-41.

"Under the inevitable discovery doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." United States v. Heath, 455 F. 3d 52, 55 (2d Cir. 2006).  The doctrine "requires the district court to

-14-

determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred". Id.

However, "the government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation . . . . On the contrary, . . . proving that a judge *could* validly have issued a warrant supported by probable cause was not necessarily enough to establish that a judge *would* have issued the warrant in question." Heath, 455 F. 3d at 58-59 (emphasis in original). "Inevitable discovery analysis therefore requires a court to examine *each of the contingencies* that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of that having occurred." Id. at 60 (emphasis in original).

The first contingency is whether, absent the illegal search, the warrant would have been sought (for obviously, a warrant which has not been applied for cannot be obtained). The government admits that "the precise reason for seeking the warrant was that, based upon the items observed in plain view, Hurwitz believed there was more evidence in the apartment - to include money." Government's brief [567], p. 11. The government's failure to prove that the warrant would have inevitably been sought had the initial search not occurred precludes its reliance upon the "inevitable discovery" doctrine. *See, e.g.,* United States v. Eggers, 21 F. Supp. 2d 261, 272 (S.D.N.Y. 1998) ("the government here has failed to demonstrate that the agents inevitably would have applied for a warrant"); United States v. Nieves, 27 F. Supp. 2d 636, 641-42 (D. Md. 1998) ("the subsequently-obtained warrant . . . would not have been sought and obtained if the search . . . had yielded no contraband"); United States v. Conner, 127 F. 3d 663,

668 (8th Cir. 1997) ("the officers would not have sought either search warrant but for their observation of what they believed to be the proceeds of the . . . burglary following their illegal entry into the motel room . . . . Given that finding and the fact that the government offers no concrete evidence that police explored any alternative investigatory approach, we find no basis to apply the inevitable - discovery exception to this case").

Even if the government had proven that SA Hurwitz would inevitably have applied for the search warrant, it has failed to prove the second contingency, namely that the warrant inevitably would have issued. The fact that the indictment furnished probable cause to arrest the defendants for involvement in criminal activity "does not answer the question of whether there was probable cause to search [defendants'] residence for evidence of that involvement. It is well settled that probable cause to arrest an individual does not, in and of itself, provide probable cause to search that person's home." United States v. Rios, 881 F. Supp. 772, 774 (D. Conn. 1995).

"In cases in which a claim of inevitable discovery is based on expected issuance of a warrant, the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search is of great importance." United States v. Cabassa, 62 F. 3d 470, 473 (2d Cir.1995). The fact that SA Hurwitz did not even begin to apply for a search warrant until after the initial search strongly suggests that, absent the results of the initial search, even he believed that probable cause for a search warrant was lacking. "The government's showing of probable cause was not 'overwhelming' . . . . There is thus the residual possibility that a magistrate judge would have required a stronger showing of probable cause." Cabassa, 62 F.3d at 473-74.

Since the government has failed to prove that the search warrant inevitably would have been applied for and obtained had the initial search not occurred, it may not rely upon the "inevitable discovery" doctrine to avoid suppression of the evidence seized on September 12, 2007. Furthermore, since "the government has failed to show that the evidence was obtained by means sufficiently distinguishable to be purged of the primary taint", United States v. Felix, 2009 WL 483178, *4 (W.D.N.Y. 2009) (Arcara, J.), I recommend that the evidence obtained pursuant to the September 13 search warrant likewise be suppressed.

**CONCLUSION**

For these reasons, I recommend that the motions for suppression [225, 247] be granted. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by May 10, 2010 (applying the time frames set forth in Fed. R. Crim. P. 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically

-17-

identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 58.2(a)(3) may result in the district judge's refusal to consider the objection.

**SO ORDERED.**

Dated: April 21, 2010

>  /s/ Jeremiah J. McCarthy
>  JEREMIAH J. MCCARTHY
>  United States Magistrate Judge