UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                                                                    DECISION AND ORDER
                v.                                                                           07-CR-212A

LING ZHEN HU
XIAO CHEN LIN,

                                  Defendants.

## **BACKGROUND**[1]

On September 11, 2007, a grand jury returned an indictment against defendants Ling Zhen Hu (Hu) and Xiao Chen Lin (Lin) and others charging them with engaging in a conspiracy to sell counterfeit Nike sneakers throughout the United States. Arrest warrants were issued for Hu and Lin and on September 12, 2007, at 6:00 a.m., Department of Homeland Special Agents Brian Hurwitz and Michael Cameron and

---

[1] Where the Magistrate Judge conducts an evidentiary hearing and makes credibility findings on disputed issues of fact, this Court will ordinarily accept those credibility findings. *See Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) ("[A] district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge.") (quoting *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999); *see also Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir. 1989) ("Had the district court rejected the magistrate's conclusions regarding the credibility of the central witnesses without hearing live testimony from those witnesses, troubling questions of constitutional due process would have been raised."). However, in this case the Magistrate Judge noted that there was a discrepancy between the version of events offered by the government and that offered by the defendants, but declined to resolve any credibility issues. Instead, he determined that suppression was warranted even if the government's version of the events were credited. Because the Magistrate Judge did not make adverse credibility findings, for the purposes of this review, the Court will credit (as the Magistrate Judge did) the government's version of the events.

several others went to the defendants' residence at 3802 149th Place, Flushing, New York ("premises").  That premises consisted of a three-story apartment building.

Agents rang all three doorbells.  They waited about two minutes. Then one of the agents noticed a light go on in the hallway and a man walking down the stairs toward the entryway.  Agent Cameron yelled "police," and the man fled up the stairs toward the third floor.  Agents entered the building through an unlocked metal door with grating. Agent Cameron and several others chased the man up toward the third floor while other agents, including Hurwitz, stopped at the second floor apartment. Hurwitz knocked on the door[2] and a woman answered.  She was wearing only a tank top and underwear. Agent Hurwitz showed her the arrest warrant.  She opened the door and moved out of the way.  Hurwitz entered the foyer and begin engaging her while other agents followed in behind him to see who else was in the apartment.  (Tr. of Hearing, Dkt. 507, at 15, 90-91).  Hurwitz identified the woman as Hu from a photograph that he had.  She had difficulty communicating in English.  The agents who entered the apartment behind Hurwitz discovered the defendants' fourteen-year-old son, but no one else.

In the meantime, agents pursuing the fleeing man located him hiding in a bathroom of the third floor apartment.  Suspecting that he was defendant Lin, they brought him to the second floor to confirm his identity.  (Tr. of Hearing, Dkt. 523, at 80). Lin was wearing only a t-shirt and underwear.

Agents escorted both defendants into the apartment and seated them on the living room couch.  Lin, who also had difficulty communicating in English, was identified

---

[2] As discussed later, there is a factual dispute as to whether agents knocked on the door or entered without knocking.

2

using a passport and license found in the apartment. Once identified, Hurwitz escorted Lin to his bedroom to get dressed while Hu remained on the couch. (Tr. of Hearing, Dkt. 507, at 21-22). Agents decided to forgo handcuffing the defendants as a courtesy because their son was in the apartment. However, they opened the drawer to a coffee table directly in front of the couch where Hu was seated to ensure that no dangerous objects were located within reach. When they opened the coffee table drawer, they saw $1,800 in cash laying on top. (Tr. of Hearing, Dkt. 507, at 99). Hurwitz, who testified about the discovery, was not present when this occurred. Instead, he was in the bedroom getting Lin dressed to leave. Information about the $1,800 was later relayed to him by Agent Glenn Bartley. (Tr. of Hearing, Dkt. 507, 99-100).

Once Lin was dressed, he was returned to the couch and Hu was given a chance to get dressed. It took about ten minutes for each defendant to get dressed, for a total of twenty minutes. After both defendants were dressed, they were returned to the living room couch. (Tr. of Hearing, Dkt. 507, at 26-27). When asked why Agents did not immediately remove the defendants from the apartment at that point, Hurwitz testified that agents waited for the defendants' son to get dressed and off to school before removing the defendants from their apartment. He also stated that they were attempting to reach an interpreter via telephone during that time to determine whether the defendants would consent to a search of their apartment. When asked whether there was any reason for the agents to wait for the defendants' son to leave the apartment before arresting the defendants, Agent Hurwitz said "no." (Tr. of Hearing, Dkt. 507, at 105). At some point, an interpreter was reached, and defendants (through the interpreter) refused to consent to a search.

3

While in the apartment, agents observed a variety of items. Specifically, Hurwitz testified that he and other agents also observed "documents, photographs, and evidence of counterfeiting and trafficking in counterfeit merchandise, both in the living room and in the kitchen." (Tr. of Hearing, Dkt. 507, at 27). They also saw a large cash counting machine in the corner of the living room, in an open box, and (as noted) found $1,800 in cash in a coffee table drawer that they opened because it was within reach of the couch where the defendants were seated. All of these items were seized, purportedly under the plain view exception. Agents remained in the apartment for a total of an hour or so. At about 7:00 a.m., the defendants' son left for school and the defendants were removed from their apartment.[3]

A search warrant was obtained the following day, on September 13, 2007, at 3:26 p.m. from Magistrate Judge Go in the Eastern District of New York. As probable cause for the warrant, agents relied upon information already known about the defendants' alleged involvement in counterfeit trafficking, as well as items purportedly observed in "plain view" during the arrest of the defendants on September 12, 2007. Specifically, the application stated:

> While effecting the arrests, a money-counting machine was observed in plain view on the floor of the living room. On the coffee table, in plain view, there was [sic] stack of photographs of sneakers. Based upon my investigation and experience, I am aware that sellers of counterfeit merchandise frequently show pictures of their products to potential buyers. During a security sweep, agents also found in the drawer of a

---

[3] Although not entirely clear from the record, it appears that some agents stayed behind to secure the apartment while others sought to obtain a search warrant based upon items observed while in the apartment.

4

> coffee table in the living room approximately $1800 in United States currency *on the coffee table, records of deposits, money orders, and assorted financial documents, which included a computer print-outs.*[4] A desktop computer, printer and fax machine were also observed in the right rear bedroom. Cell phones were also observed in the bedroom, living room and kitchen areas.

(*See* Affidavit of Brian Hurwitz, in support of search warrant, at ¶ 19) (emphasis added). Upon execution of the search warrant, officers discovered more evidence in the apartment, including a substantial amount of cash.

Defendants moved to suppress all of the evidence seized from the apartment as obtained in violation of the Fourth Amendment. They argued that officers had no basis to be in the apartment in the first place and therefore should not have been in a position to view the items purportedly observed in plain view. They also argued that the incriminating nature of the items seized was not immediately apparent and therefore did not fall within the scope of the plain view exception. Since observation of the plain view items formed the basis of the agents' probable cause to obtain a search warrant, they argued that all items seized pursuant the warrant should be suppressed as fruit of the poisonous tree.

Following a three-day hearing, Magistrate Judge McCarthy, to whom the motion had been referred, determined that suppression was warranted. The Magistrate Judge concluded that entry into the building was proper because agents had arrest warrants

---

[4] The emphasized portions are factually inconsistent with the hearing testimony indicating that these items were found *on the kitchen table,* not the living room table. Additionally, Agent Hurwitz failed to apprise the Magistrate Judge of the fact that all of these "records of deposits, money orders, and assorted financial documents, which included a computer print-outs" were written in Chinese, and that none of the agents could read Chinese.

and a reasonable basis to conclude that the defendants were home at the time. However, as to entry into the apartment, Magistrate Judge found that agents were only authorized to enter the foyer of the apartment (where Hu was first encountered) and immediately adjoining areas, but they were not authorized to enter kitchen and living room areas where the items purporting to be in plain view were discovered. The Magistrate Judge found that the agents could, "'as a precautionary matter, and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched,'" (Report and Recommendation ("R and R"), Dkt. 587, at 9 (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)), but that they were "not entitle[d] to look in other rooms of the apartment." *Id.* Hence, the Magistrate Judge determined that the items found in the living room and the kitchen should be suppressed because those area were not immediately adjoining the foyer and agents had no basis to believe that anyone inside posed a danger. The Magistrate Judge further determined that, even if agents were authorized to enter those areas, a plain view seizure was improper because the incriminating nature of the items was not "immediately apparent." The Magistrate Judge recommended that all items discovered during the September 12, 2007 entry be suppressed. Since discovery of those items formed the basis for probable cause to obtain a search warrant, the Magistrate Judge also recommended that the money discovered during execution of the search warrant be suppressed as fruit of the poisonous tree.

Both the government and the defendants filed objections. The government objects to the Magistrate Judge's determination that suppression was warranted, and

6

the defendants objected to the Magistrate Judge's determination that entry into the premises was authorized.

This Court heard oral argument on the objections on June 25, 2010 and September 3, 2010. For the reasons stated, this Court finds that– if the government's version of the facts is credited–agents were authorized to enter the living room and kitchen areas where plain view items were purportedly observed. As to whether some or all of the items observed fall within the plain view exception, the Court finds that factual and credibility findings are necessary to that determination. Accordingly, the matter is remanded to the Magistrate Judge for further proceedings consistent with the Decision and Order.

## DISCUSSION

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made.

### A. Authority to Enter 3802 149th Place

The defendants object to Magistrate Judge McCarthy's determination that the police were lawfully entitled to enter 3802 149th Place on September 12, 2007. This Court adopts Magistrate Judge McCarthy's conclusion that the agents had probable cause to enter the building to arrest defendants Hu and Lin. During the hearing, the government presented evidence that: (1) agents possessed valid arrest warrants for each of the defendants; (2) agents had conducted a records check which concluded

7

that Hu and Lin lived on the second floor apartment of 3802 149th Place in Flushing, New York; (3) agents confirmed that a van bearing a license plate in which Hu and Lin had previously been observed was parked outside the residence at the time of the arrest; (4) agents had observed both defendants leaving that address on a prior occasion; and (5) the arrest warrants were executed at 6:00 a.m. That evidence provided agents with ample cause to believe that the defendants were in the second floor apartment of 3802 149th Place at the time of their arrest. During the hearing, there was conflicting evidence regarding the color of the van purportedly owned by the defendants and observed outside of the premises on the morning of the arrest. That factual dispute is irrelevant to suppression. Even if agents had observed *no* van that morning, they had ample cause to believe that the defendants were inside based upon their knowledge that both defendants lived in the second floor apartment of that building and the fact that the warrants were being executed in the early morning, at a time when defendants can reasonably be expected to be at home. "[C]ourts have recognized that once officers have a reason to believe that a suspect lives in a particular dwelling, they may reasonably infer that he will be home early in the morning." *See Tyson v. Willauer*, 290 F. Supp. 2d 278, 285 (D.Conn. 2003). Agents could reasonably infer that the defendants were in their apartment at 6:00 a.m. when they went to execute the arrest warrants and therefore were lawfully entitled to enter the premises. *See* R and R, at 8; *see also Payton v. New York*, 445 U.S. 573, 603 (1980) (holding that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within").

The defendants argue that the entry was unauthorized because agents violated the knock-and-announce rule. Crediting testimony by government witnesses, there was no violation of the knock-and-announce rule. Agent Hurwitz and Agent Cameron both testified that agents rang all three doorbells and knocked on the exterior door before seeking to gain access to the defendants' apartment. They waited about two minutes. Agent Cameron testified that he then saw a hallway light turn on and a man (later identified as defendant Lin) start down the stairs, and then flee when Cameron yelled "police." There can be no doubt that under the circumstances, the agents were authorized to enter the building to execute the arrest warrants.

The defendants point to discrepancies in the agents' testimony as to whether the foyer door was locked or unlocked. Regardless of whether the foyer door was unlocked or locked, agents were authorized to gain entry to the premises after having complied with the knock-and-announce requirement. The agents' testimony that they announced their presence is corroborated by the fact that defendant Lin was found hiding in the bathroom of another person's apartment on the third floor. How else would Lin have known to flee to the third floor if the police had not made their presence known? In any event, even if there had been a violation of the knock-and-announce rule, that would not provide a basis for suppressing evidence. See *Hudson v. Michigan,* 547 U.S. 586 (2006), *United States v. Acosta*, 502 F.3d 54, 59 (2d Cir. 2007); *United States v. Snow*, 462 F.3d 55, 61, n.4 (2d Cir. 2006).

B. <u>**Authority to Enter Second Floor Apartment**</u>

The next issue is whether, and to what extent, agents were authorized to enter the second floor apartment. The Magistrate Judge found that agents were authorized "to look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched," *see* R and R, at 9 (quoting *Maryland v. Buie,* 494 U.S. 325, 334 (1990)), but that they were not authorized to go into other rooms, including the living room and kitchen, absent some basis to believe that there were others inside who might pose a danger. Although the Magistrate Judge correctly cited the *Buie* standard, there are two key facts that rendered entry into the apartment permissible in this case.

First, agents were authorized to enter the apartment to look for and arrest Lin. The arrest warrant for Lin implicitly carried with it the limited authority to enter his apartment to arrest him. *See Payton v. New York*, 455 U.S. 573 (1980); *see also United States v. Alejandro*, 368 F.3d 130, 133, n.3 (2d Cir. 2004)("The officers in the instant case had an arrest warrant for [the defendant] when they arrived at his apartment. They therefore had the authority to enter, if not to break open and enter, his apartment because there was reason to believe he was inside."). When agents initially entered the apartment, Mr. Lin had not been apprehended and it was unknown whether the individual that other agents were pursuing up the stairs to the third floor was Lin or someone else. The officers who stayed on the second floor, armed with an arrest warrant for Lin and probable cause to believe that he was home, had authority to enter Lin's apartment and search anywhere he might be found – including the kitchen and

10

living room.⁵ *See Maryland v. Buie,* 494 U.S. 325, 332-33 (1990) ("Possessing an arrest warrant and probable cause to believe Buie was in his home, the officers were entitled to enter and to search anywhere in the house in which Buie might be found. Once he was found, however, the search for him was over, and there was no longer that particular justification for entering any rooms that had not yet been searched"); *United States v. Stover*, 474 F.3d 904 (6th Cir. 2007) ("When officers have obtained an arrest warrant and they have reason to believe the suspect is in the house, they may search anywhere that the suspect might reasonably be found."); Wright & Miller, *Federal Practice & Procedure*, § 55 (2010) ("An arrest warrant implicitly carries with it the limited authority to enter the dwelling where the suspect lives when there is reason to believe the suspect is inside. Once inside the house pursuant to a warrant the police may search anywhere the suspect might reasonably be found."); 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 6.3(a) (4th ed.) ("[T]he Supreme Court made clear the unquestioned authority of police lawfully within the premises for the purposes of making an arrest to search those premises to the extent necessary to find the individual to be arrested."). It was only after those agents had entered the defendants' apartment and conducted this initial sweep that the man fleeing to the third floor was brought down and identified as defendant Lin.⁶

---

⁵ That Agent Hurwitz improperly characterized the search as a protective sweep (when in reality it was an entry to search and arrest Lin) is of no moment. The salient point is that the arrest warrant implicitly carried with it the authority to enter the Lin apartment and search everywhere that Lin could be found. *See United States v. Klump*, 536 F.3d 111, 118 (2d Cir. 2008) (noting that the "subjective intent" of officers is irrelevant as long as the facts, viewed objectively, justified their actions).

⁶ Agent Cameron testified that about 5 to 10 minutes elapsed between the time he chased Mr. Lin up to the third floor and brought him down to the second floor. (Tr. of Hearing,

The second key fact making entry into the living room permissible in this case is that both defendants were in a state of undress when apprehended. Hu wore only a tank top and underwear, and Lin was dressed in a t-shirt and underwear. Numerous circuits, including the Second Circuit, recognize that a defendant's scant clothing provides exigent circumstances for a warrantless entry so as to permit a defendant to search for proper clothing. *See e.g. United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) (allowing an officer's entry into a bedroom solely for the purpose of maintaining control over defendant while she dressed herself); *see also United States v. Gwinn*, 219 F.3d 326, 335 (4th Cir. 2000) (determining that a defendant's lack of shirt and shoes while outdoors justified an officer's warrantless re-entry into the house); *United States v. Butler*, 980 F.2d 619, 621-22 (10th Cir. 1992) (permitting police to retrieve a defendant's shoes from his house, but noting that entry into the house does not immediately follow from "the desire of law enforcement officers to complete the arrestee's wardrobe"). Indeed, the Second Circuit has stated that officers have a "duty" to find appropriate clothing of a defendant upon arrest or to permit that defendant an opportunity to do so herself. *DiStefano*, 555 F.2d at 1101 (citing *United States v. Titus*, 445 F.2d 577 (2d Cir.), *cert. denied*, 404 U.S. 957 (1971); *see also United States v. Rudaj*, 390 F. Supp. 2d 395, 401 (S.D.N.Y. 2005) ("The Second Circuit has long recognized that an arresting officer has a duty to ensure that an arrestee is sufficiently dressed before removing her from her residence."). In the fulfillment of that duty, the officer may accompany the arrestee into the residence "to maintain a 'watchful eye' on

---

Dkt. 523, at 79). In the meantime, the agents on the second floor entered and conducted a sweep of the apartment looking to see who was inside. That process took only a couple of minutes.

12

her and to assure that she did not destroy evidence or procure a weapon." *Rudaj,* 390 F. Supp. 2d at 401.

It was entirely proper for some of the agents to accompany Mr. Lin into the bedroom while he got dressed. During that time, it was reasonable for other agents to seat Ms. Hu on the living room sofa –which is immediately adjacent to the foyer where Hu was first encountered – for her to wait her turn to get dressed. The touchstone of Fourth Amendment jurisprudence is reasonableness. *Brigham City v. Stuart*, 547 U.S. 398 (2006). Having encountered both defendants in a state of undress, it was reasonable for officers to separate the defendants, giving each a turn to put on appropriate clothing. Mr. Lin was brought to the bedroom first by some agents, while others secured Ms. Hu on the living room sofa to maintain a "watchful eye" on her until it was her turn to get dressed. *See DiStefano*, 555 F.2d at 1101. The officers may have chosen to keep Ms. Hu on the sofa while another officer went into the bedroom to secure her clothes. *Rudaj,* 390 F. Supp. 2d at 401 ("[T]he officers may choose to keep the arrestee in a secure location and send one of their own to get the clothing."). "Either way, a warrantless entry is justified and an officer's presence in the arrestee's residence is lawful." *Id.*

Defendants suggested during cross-examination that it would have been more appropriate for the officers to hold Ms. Hu in the foyer while her husband was permitted to get dressed. That the officers could have taken less intrusive measures is beside the point. What matters is whether the actions that they did take were reasonable and within the scope of the Fourth Amendment. *Palacios v. Burge*, 589 F.3d 556, 565 (2d Cir. 2009)("[R]easonableness under the Fourth Amendment does not require employing

13

the least intrusive means. . . .")(quotation omitted). This Court finds that it was reasonable under the circumstances for officers to seat Ms. Hu on the living room couch while they waited for Mr. Lin to get dressed.[7]

Importantly, Hu testified that she was never in the living room. To the extent that the Magistrate Judge were to find that testimony credible, that would effect the above analysis. But if the government's version of the evidence is to be believed, the Magistrate Judge's conclusion that the agents were not authorized to be in the living room or kitchen is incorrect.

C. **Plain View Observation of Items in Living Room and Kitchen**

Alternatively, the Magistrate Judge found that, even if the officers were lawfully in the living room and kitchen, the items seized did not fall within the plain view exception to the Fourth Amendment. Evidence at the hearing showed that officers observed various items in the living room (namely a cash counting machine, photographs of sneakers and the $1,800 found in the coffee table drawer) and in the kitchen (consisting of receipt books, sales and order slips, ledger books, personal records, and more sneaker photographs). With regard to the books, receipts, sales slips and personal records, those items were written in Chinese and none of the agents could read Chinese.

---

[7] The Magistrate Judge correctly noted that the government cannot justify a search merely by bringing the item that they would like to search near the person arrested, or vice versa. *See* R and R, Dkt. 587, at 13 (citing *United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993)). However the Magistrate Judge made no finding that agents brought the defendants into the living room in bad faith as a ruse to search items found therein. Absent such a finding and if the government's version of events is credited, this Court concludes that their presence in the living room was proper.

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *United States v. Miller*, 430 F.3d 93, 102 (2d Cir. 2005) (holding that the "plain view" doctrine applied to a shotgun seized from an open closet during a protective sweep that an officer completed while serving an order of protection"). In order to find evidence admissible under the plain view exception, the government must show by a preponderance of the evidence that: (1) government agents were lawfully in the position from which they viewed the seized object; (2) the object was plainly visible without touching it; and (3) the incriminating character of the object was immediately apparent. *See Horton v. California*, 496 U.S. 128, 136-37 (1990); *Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1971).

The Magistrate Judge found that items seized did not fall within the purview of the plain view doctrine because their incriminating nature was not "immediately apparent." To satisfy the "immediate apparent" requirement, there must be probable cause to believe that the evidence seized constituted evidence of a crime. In *Texas v. Brown*, the Supreme Court explained that the "immediately apparent" test does not require "an unduly high degree of certainty as to the incriminatory character of evidence." *Brown*, 460 U.S. 730, 741-42 (1983). The "immediately apparent" language does not require that police officers "know" that certain items are contraband or evidence of a crime. Rather, there need only be probable cause to believe that the item may be associated with criminal activity. *Id.* "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id*. In *Brown,* the Supreme

Court found that an officer who saw balloons tied off at their end had probable cause to believe that balloons might contain illicit substances, based in part on the officer's knowledge that balloons tied off in that manner are used in narcotics trafficking. *See also United States v. Reyes*, No. 3:06cr120 (SRU), 2007 WL 419636 (D. Conn. Jan. 30, 2007) (finding seizure of cellular telephones was proper under plain view doctrine because incriminating nature of such items was readily apparent to a trained DEA agent with over ten years of law enforcement experience who knows that such items are tools of the drug trade).

Agent Hurwitz testified that the incriminating nature of various items was readily apparent to him based upon his knowledge that the defendants were being arrested for counterfeit sneaker trafficking, and based upon his nine years of experience investigating counterfeit trafficking rings. The Magistrate Judge discounted Hurwitz's experience and knowledge of the investigation because he erroneously believed that: (1) no agents were entitled to be in the living room and kitchen in the first place; and (2) even if some agents were authorized to conduct a protective sweep of the living room and kitchen, Hurwitz did not do the protective sweep and therefore he could not have personally observed the items. Because Hurwitz did not view the items during the initial entry, his knowledge could not be imputed to the other agents.

To the extent that the Magistrate Judge believed that Hurwitz was required to personally observe the items himself during the initial sweep, that was incorrect. As the government correctly notes, law enforcement officers are entitled to rely upon the collective knowledge of *all officers at the scene* for the purposes of determining whether probable cause exists. *See e.g. United States v. Garcia*, 413 F.3d 201, 213 (2d Cir.

16

2005).[8]  Hence, other officers were entitled to rely upon Agent Hurwitz's expertise in assessing probable cause.  Even if the incriminating nature of the photographs, cash machine or other items was not immediately apparent to the officer who first came upon them, the Fourth Amendment does not prohibit that officer from sharing his observations with other agents at the scene.  The key issue is whether the officer who first observed the item was legally permitted to be in the place where the item was visible.

Although agents were authorized to be in the living room for a period of time when they waited for both defendants to get dressed, there appears to have come a point when the officers should have left.  After both defendants were dressed, they were returned to the couch while: (1) agents purportedly waited for the defendants' son to get dressed; and (2) they tried to reach an interpreter to see whether the defendants would consent to a search.  However, when asked whether it was necessary for officers to wait for the defendants' son to get dressed, Hurwitz testified "no."

Whether the officers' prolonged presence in the apartment exceeded the bounds of the Fourth Amendment depends on questions of fact and credibility determinations not yet rendered.  The Magistrate Judge seemed understandably troubled by testimony suggesting that, while in the apartment, officers looked around to see what they could.  On the other hand, the government argues that officers were simply logging in items already determined to be incriminating based upon what the officers saw while they

---

[8]   Although the Second Circuit has not yet applied the "collective knowledge" doctrine to plain view seizures, other circuit courts have.  *See, e.g., United States v. Armstrong*, 554 F.3d 1159, 1163 (8th Cir.), *cert. denied*,129 S.Ct. 2805 (2009) ; *United States v.  Waldrop*, 404 F.3d 365 (5th Cir. 2005); *United States v. Wells*, 98 F.3d 808 (4th Cir. 1996).

were lawfully conducting the initial sweep and/or guarding Hu in the living room. Whether the items were actually seen at a time when the officers were lawfully in a position from which they could view that object, whether the object was plainly visible without touching it, and whether the incriminating nature of each object seized was readily apparent, hinge on factual and credibility determinations not yet made. Simply put, it is not clear from the record exactly what the officers saw and when they saw it. For example, if the officers noticed the sneaker photographs and cash counting machine during their initial sweep or while securing Hu on the couch, those items would appear to be admissible under the plain view exception as long as they were plainly visible and the incriminating nature of those items was readily apparent. On the other hand, if the Magistrate Judge were to find that officers were required to remove the defendants as soon as they were dressed, but instead, agents unlawfully remained in the apartment and, in doing so, wandered around trying to get a closer inspection of items in the kitchen, suppression might be warranted. Likewise, the Magistrate Judge might find that the incriminating nature of the items written in Chinese (which the officers could not read) was not readily apparent.[9] Until those factual findings are made, however, further review is impossible.

In ruling on the motion to suppress, the Magistrate Judge should also conduct the risk/benefit analysis (i.e., whether "the benefits of deterrence . . . outweigh the

---

[9] Or, the Magistrate Judge may find that officers brought Hu into the living room in bad faith as a ruse to see what was in the apartment. Although he correctly noted that "agents are not allowed to simulate circumstances warranting application of the incident-to arrest-exception merely by bringing the item they wish to search into the area near the person arrested, or vice versa," R and R, at 13 (quoting *United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993), he made no finding that they did so.

[societal] costs" of the exclusionary rule) articulated by the Second Circuit in *United States v. Julius*, 610 F.3d 60 (2d Cir. 2010), and the Supreme Court in *Herring v. United States*, ___U.S.___, 129 S.Ct. 695 (2009). *Julius* was issued after the Magistrate Judge submitted his report and recommendation and therefore he did not have the benefit of the Second Circuit's analysis at that time. Because the cost/benefit analysis hinges on the culpability of the law enforcement officers, that analysis cannot be done at this juncture. That is, whether suppression is appropriate will turn upon whether, and if so to what degree, the officers acted improperly under the circumstances. The determination of impropriety has yet to be made.

## **CONCLUSION**

The Court finds that further factual and credibility findings are necessary before the motion to suppress can be decided. The matter is remanded to the Magistrate Judge for further proceedings in light of the foregoing. Nothing herein shall preclude the Magistrate Judge from reopening the hearing and obtaining additional evidence if he finds it appropriate and necessary.

SO ORDERED.

*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: November 3, 2010