UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA                    **SUPPLEMENTAL REPORT AND**
                                            **RECOMMENDATION**

                                            Criminal No. 7-CR-212(A)(M)

                    v.

LING ZHEN HU and
XIAO CHEN LIN

                         Defendants.
_____

## INTRODUCTION

In accordance with Judge Arcara's November 3, 2010 Decision and Order [667][1] (2010 WL 4451532) (hereafter "D&O"), this Report and Recommendation supplements my Report and Recommendation dated April 21, 2010 [587] which addressed defendants' motions for suppression of evidence [225, 247]. Familiarity with the D&O, and with my previous Report and Recommendation, is presumed.

Having re-reviewed the hearing transcript and exhibits, and having considered the parties' submissions filed subsequent to the issuance of the D&O [687, 688], I again recommend that the suppression motions be granted.

## ANALYSIS

**A.    Is There a Need to Reopen the Suppression Hearing?**

In remanding the suppression motions to me, Judge Arcara noted that "it is not clear from the record what the officers saw and when they saw it", and stated that "[n]othing herein shall

---

[1]         Bracketed references are to CM/ECF docket entries.

preclude the Magistrate Judge from reopening the hearing and obtaining additional evidence if he finds it appropriate and necessary". D&O, pp.18, 19. On November 4, 2010 (the day after the D&O issued), I held a conference with counsel and asked whether they wished to reopen the hearing to submit further evidence as to what had occurred. They said no. [671, 672].[2]

Even if the parties *had* asked me to reopen the hearing, I believe it would be neither appropriate nor necessary to do so. The government stated at the outset that "this is a plain view hearing" ([507], p.10), and acknowledged that "it's the government's burden of proof that the plain view exception applies". [481], p.112. The government knew what it must prove. "In order to find evidence admissible under the plain view exception [to the warrant requirement], the government must show by a preponderance of the evidence that: (1) government agents were lawfully in the position from which they viewed the seized object; (2) the object was plainly visible without touching it; and (3) the incriminating character of the object was immediately apparent." D&O, p. 15; Minnesota v. Dickerson, 508 U.S. 366, 375 (1993).

Since "it is not clear from the record what the officers saw and when they saw it" (D&O, p.18), the government, as the party bearing the burden of proof, must bear the consequences of that lack of clarity.[3] "If the Government believed that these matters were not sufficiently clarified at the suppression hearing before [the] Magistrate Judge . . . , it had every opportunity and incentive to explore those matters further at that hearing. The Government's present request [to reopen the

---

[2]     Although defendants request a hearing "to explore the policy concerns implicated by the question of enforcing the exclusionary rule here" (defendants' joint supplemental memorandum [688], p. 26), I do not believe that such a hearing is necessary in this case. *See* discussion at pp.14-16, *infra*.

[3]     In fact, I voiced my concerns about the quality of the government's proof even during the hearing. [481], pp.112-18.

hearing] amounts to little more than an attempt at a second bite at the apple, in the hope that this time around the result will be more favorable to the Government". United States v. Valentine, 657 F.Supp.2d 388, 394 (W.D.N.Y. 2009) (Larimer, J.).  *See also* United States v. Santiago, 720 F. Supp.2d 245, 251 (W.D.N.Y. 2010) (Siragusa, J.).


**B.  Has the Government Met its Burden of Proof by a Preponderance of the Credible Evidence?**

Although my previous Report and Recommendation did not address credibility issues (since I concluded that even if the government's version of events were believed, it could not satisfy the criteria for the plain view exception), Judge Arcara has directed me to do so now: "As to whether some or all of the items observed fall within the plain view exception, the Court finds that factual and credibility findings are necessary to that determination." D&O, p.7.

Preliminarily, let me address the government's suggestion that Judge Arcara has already made certain factual findings which bind me.  *See*, *e.g.*, government's memorandum [687], p.4 ("the District Court specifically found the agents complied with [the] 'knock and announce' requirement when entering the building. In so finding, the District Court credited the testimony of agents Hurwitz and Cameron over the testimony of defendant Hu").

I disagree. Although Judge Arcara did state that "[c]rediting testimony by government witnesses, there was no violation of the knock-and-announce rule" (D&O, p.9), he credited the government's testimony only because I did. "Because the Magistrate Judge did not make adverse credibility findings, the Court will credit (as the Magistrate Judge did) the government's version of the events." D&O, p.1, n.1. Judge Arcara made clear that he did not intend

to pre-empt me from initially assessing the credibility of the evidence: "Had the district court rejected the magistrate's conclusions regarding the credibility of the central witnesses without hearing live testimony from those witnesses, troubling questions of constitutional due process would have been raised." D&O, p.1, n.1 (*quoting* <u>Grassia v. Scully</u>, 892 F.2d 16, 19 (2d Cir. 1989)).

"It is within the province of the district court as the trier of fact to decide whose testimony should be credited . . . .[a]nd whether the party having the burden of proof has persuaded it as factfinder that the requisite facts are proven." <u>Diesel Props S.r.l. v. Greystone Business Credit II LLC</u>, ___F.3d___, 2011 WL 37813, **7-8 (2d Cir. 2011). Therefore, I must decide whether the government has proven its case by a preponderance of the evidence, "mean[ing] the greater part of the believable and reliable evidence, not in terms of the number of witnesses or the length of time taken to present the evidence but in terms of the quality and the weight and convincing effect it has." <u>Parra v. Ercole</u>, 2010 WL 2612679, *3 (S.D.N.Y. 2010).

Since the facts are in dispute, my assessment of credibility must necessarily be adverse to one side or the other. "[A]n adverse credibility determination . . . is . . . appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony". <u>Diallo v. I.N.S.</u>, 232 F.3d 279, 287-88 (2d Cir. 2000). In my view, the government's position on these motions is so replete with inconsistencies, contradictions, and improbabilities as to be unworthy of belief - not just in particulars, but in general. Not only did its witnesses contradict themselves and each other, but the government contradicted its own witnesses and on occasion changed its position. The following examples, while not exclusive, are indicative of my concerns:

■ The government argues that "the record is devoid of any evidence that the arrest team conducted a wholesale search of the premises". Government's memorandum [687], p.17. However, agent Brian Hurwitz admitted that he "went around through the whole apartment . . . to see whatever [he] could see". [481], p.79.

■ The government states that "[t]he total time spent in the apartment was no more than 90 minutes". Government's memorandum [687], p.17. However, agent Hurwitz admitted that he was there for a "couple of hours" and that other agents stayed in the apartment "all day and all night" in order to "secur[e] the location for the application for a search warrant". [507], p.60.[4] Agent Michael Cameron testified that he was in and out of the apartment from 6:00 a.m. on September 12, 2007 until 3:30 p.m. the next day. [523], p.101.

■ The government *never* suggested to me that agents were looking for defendant Lin in the second floor apartment. Agent Cameron testified that he saw defendant Lin run up the stairs to the third floor, and that he chased him there and found him hiding in a bathroom, where he placed him under arrest.[523], pp.76-79, 116. The government told me that "the agents *only* conducted a Buie-type protective sweep" of the apartment after arresting defendant Hu. Government's post-hearing brief [567], p.27, n.42 (emphasis added).

However, in proceedings before Judge Arcara, the government changed course, suggesting (for the first time) that agents were also looking for defendant Lin in the apartment. "Although in his testimony Hurwitz characterized the initial sweep of the apartment as one

---

[4] There was no need to "secure the location" from inside the apartment. "Once it was determined that third persons were not present, the agents should have left the room. The public interest thereafter in securing the room . . . could have been served just as well by stationing a guard outside the door." United States v. Agapito, 620 F.2d 324, 337 (2d Cir.), cert. denied, 449 U.S. 834 (1980).

conducted for officer safety, the objective facts reflect that at the time it was conducted, Lin had not yet been apprehended . . . .  In light of the rapidly unfolding events, there was no objective reason to desist from looking for Lin throughout his apartment until such time as he was actually in custody". Government's objections [606], pp.13-14 (emphasis added).

While Judge Arcara had the discretion to consider this new argument,[5]  the government's belated change of position causes me to question its credibility. "Inconsistencies in . . . justifications for taking an action, particularly where different reasons were offered at different times (and before different tribunals), can raise a[n] issue of fact with the regard to the veracity of the proffered reasons." <u>McDowell v. T-Mobile USA, Inc.</u>, 2007 WL 2816194, *15 (E.D.N.Y. 2007), <u>aff'd</u>, 307 Fed.Appx. 531, 2009 WL 137010 (2d Cir. 2009).

■    The report prepared by agent Hurwitz states that "upon knocking and announcing, no one came to the front door, which was found to be open and accessible" (defendants' Ex. A, p.2).  However, agent Cameron, who was standing right next to agent Hurwitz at the time ([523], p.106), testified that  defendant Lin came to the front door and then ran upstairs, and that he (Cameron) had to unlock the door. [523], pp.76, 93, 103-04.

■    Agent Hurwitz testified that defendant Hu came to the door of defendants' apartment and allowed him to enter. [507], pp.15, 73, 75. Although he agreed that this is a "pretty important fact" ([481], p.91), his report failed to mention it, stating instead that defendant Hu was

---

[5]    However, he has previously held that "parties are not to be afforded a 'second bite at the apple' when they file objections to a Report and Recommendation", <u>Camardo v. General Motors Hourly-Rate Employees Pension Plan</u>, 806 F.Supp. 380, 382 (W.D.N.Y. 1992), and that "an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate". <u>Pro-Choice Network of Western New York v. Project Rescue Western New York</u>, 848 F.Supp. 400, 403 (W.D.N.Y. 1994).

"found in the second floor apartment". Defendants' Ex. A, p.2. He had no coherent explanation for this omission from the report: he denied that he forgot to include it, *and* denied that he intentionally omitted it.[481], p.93. His denial of *both* alternatives strikes me as incredible, for while an omission can be either intentional or inadvertent, it cannot be neither.[6]

Therefore, I credit defendant Hu's testimony that she "was sleeping in my own room . . . . I just heard a big bang sound. My door was open and I open my eyes. I saw two policeman [*sic*] holding a gun in front of me." [523], p.35.

- ■ While agent Hurwitz testified that defendants' residence is "a big apartment" ([481], p.79), the government argued that "Hurwitz' testimony reveals a small apartment . . . . [T]he place of arrest was a small apartment". Government's post-hearing brief [567], p.8, n.19; p. 29. If the government does not believe its own witness, why should I?

- ■ Agent Hurwitz testified that he walked through the apartment "to conduct a security sweep to see how many other people were there, or if there were any dangers to the agents", during which time he "observed documents, photographs, and evidence of counterfeiting and trafficking in counterfeit merchandise, both in the living room and in the kitchen". [507], p.27. This testimony is incredible: there was no need for him to conduct a security sweep at that time, since the other agents, who had already completed the sweep in "a couple minutes",[7] had told him that the only other person in the apartment was the defendants' son. [507], p.98.

---

[6]    Moreover, his inability to explain what had happened to his notes regarding the events of September 12 ([481], pp.88-89) casts further doubt upon his testimony.

[7]    "[A] determination of whether third persons are on the premises requires neither a lengthy nor disruptive stay." Agapito, 620 F.2d at 336; United States v. Parker, 2010 WL 781989, *3 (D.Conn. 2010).

■ Agent Hurwitz testified that approximately 30 seconds elapsed between the time he knocked on the door to defendants' apartment and the time that defendant Hu opened the door. [507], p.75. He admitted that "thirty seconds is a long time" (id.), and when asked why he did not "just walk right in", he replied "I don't know". Id. In view of his earlier testimony that "someone could have been running to jump out a window . . . [or] to retrieve a weapon" (id., p.70), his inability to explain why he would have waited at the door for 30 seconds creates serious doubt in my mind as to whether events occurred as he described them.

■ Agent Cameron testified that upon bringing defendant Lin from the third floor to the second floor apartment, he brought defendant Lin to the living room "to identify him" ([523], p.80). However, agent Hurwitz stated that he "immediately recognized" Lin when the agents brought him into the apartment, that he told Lin that he was under arrest and asked him where his clothes were, that he and other agents accompanied Lin to the back bedroom so that he could get dressed, and that only *then* was Lin taken to the couch in the living room. [507], pp.17, 21.

■ While agent Hurwitz testified that defendants Lin and Hu were both taken to the living room ([507], p.26), he also stated that they were taken to *different* areas of the apartment "to separate them . . . we had sufficient personnel where we could watch both of them in two different rooms". Id. If agents felt it necessary to separate the defendants, then why would they seat them together on the living room couch - particularly if they were not handcuffed ([507], p.34)?

In fact, the government itself acknowledges that its evidence in this regard is at best equivocal: "the credible evidence supports a finding that the agents properly placed *one or both* of the defendants in the living room area". Government's memorandum [687], p.16 (emphasis added). "If two possibilities can be inferred from the evidence, neither one can be said to have been proved

by the preponderance of the evidence required to sustain the necessary burden of proof." <u>Harlem River Consumers Co-op, Inc. V. Retail, Wholesale & Chain Store Food Employees Union, Local 338</u>, 1976 WL 1237, *16 (S.D.N.Y. 1976).

Therefore, I credit defendant Hu's testimony ([523], p.59) that she was never taken to the living room.

■ In his affidavit submitted in support of the application for a search warrant on September 13, 2007, agent Hurwitz swore to Magistrate Judge Marilyn Go that there was probable cause to believe that "money counting machines" would be found in the apartment. Government Ex. 8, ¶¶21 and 21(c)(i). He had to have known that that statement was false when made, since the money counting machine (along with considerable other evidence) was no longer in the apartment by that time, having been removed and taken to FBI headquarters on September 12, 2007:[8]

Q. "Hadn't you already seized a money counting machine?

A. Yes.

Q. And you thought there was another one there?

A. I don't know." [481], p.84.

This was no small point: it is reasonable to infer that Magistrate Judge Go would have considered the fact that some of the evidence which the government was seeking authority to seize had *already* been seized - and therefore was no longer in the premises - to be material to her consideration of the warrant application. The fact that agent Hurwitz misrepresented facts under

---

[8]     *See* defendants' Ex. A, p.2 ("All above items were secured, documented, and transported to 26 Federal Plaza, NY, NY for evidence processing").

oath to Magistrate Judge Go leads me to question his testimony on other issues as well. *See* United States v. Weinstein, 452 F.2d 704, 713 (2d Cir.1971), cert. denied, 406 U.S. 917 (1972) ("Such disregard of his oath is enough to . . . make it no more than prudent to regard all that he says with strong suspicion, and to place no reliance on his mere statements"); United States v. Schenck, 1994 WL 55765, *4 (W.D.N.Y.1994) (Skretny, J.) ("the Court finds that Paul Schenck made false statements under affirmation concerning a material matter . . . and that his entire testimony is therefore suspect").

In light of this background, I will now address the evidence sought to be suppressed..

### 1. Documents Seized from the Kitchen

#### a. Duration of the Search

Agent Hurwitz stated that the "plain view search" of the documents seized from the kitchen took "roughly an hour, two hours . . . . [a]n hour or two hours". [481], p.105. However, as it is undisputed that defendants and their son had left the apartment no later than an hour after the agents arrived (government's post-hearing brief [567], p.10), any plain view search extending beyond that time would clearly be improper.[9]

Since agent Hurwitz testified that the search lasted *either* one *or* two hours (and did not specify which documents were seen within which time frame), the government has not satisfied its burden of proof for invoking the plain view exception. Harlem River Consumers, 1976 WL

_____

[9]     A plain view search may last "no longer than it takes to complete the arrest and depart the premises". United States v. Miller, 430 F.3d 93, 98 (2d Cir. 2005), cert. denied, 547 U.S. 1206 (2006); Agapito, 620 F.2d at 336 ("Once the security check has been completed and the premises secured, no further search be it extended or limited is permitted until a warrant is obtained").

1237, *16 (S.D.N.Y. 1976); <u>Kosakow v. New Rochelle Radiology Associates, P.C.</u>, 274 F.3d 706,

731 (2d Cir. 2001) ("where the burden of proof is a preponderance of the evidence, the party with

the burden of proof . . . lose[s] in the event that the evidence is evenly balanced").


### b.      Nature of the Search

The government argues that "to the extent that [agent Hurwitz] may have been

mistaken in his assessment of some of the articles seized, the blanket suppression of all physical

evidence obtained in the Hu/Ln apartment is simply too draconian a sanction". Government's

memorandum [687], pp.16-17.

To characterize Agent Hurwitz's assessment of the documents seized as "mistaken"

is far too charitable. He admitted that he did not even look at all of the documents before seizing

them ([481], p.30), and his explanations for seizing many of the documents which he *did* look at

strain credulity. For example, he seized a composition notebook because "people that are engaged in

illegal businesses keep their records in notebooks such as this" ([481], p.34), and seized a "bill . . .

from Citibank, which appeared to be financial records. And there's also papers from a bank. Metlife

is an insurance company that insures properties, which could have been properties purchased with

the proceeds of counterfeit merchandise". <u>Id.</u>, pp.37-38. When confronted with documents such as

an insurance receipt and a  pain clinic card which he had seized, he had no idea how they were

incriminating. [507], p.121. Finally, he admitted that several of the seized documents were written

in Chinese. <u>Id.</u>, p.40.

Nor did the manner in which he observed the documents comport with the

requirements of a valid plain view search. He testified that there were numerous stacks of paper, and

that "[t]he documents on top were viewed; they were then seized. When they were seized, more

documents were revealed; they were reviewed and seized . . . . [T]he stack of paper, if the paper on

top appeared to be incriminating, that stack of papers was taken" ([481], p.104). He admitted that

some of the papers "were in plain view . . . only after [he] moved other documents". Id., p.105.

However, documents which are revealed only by moving other documents are not in

"plain view": in order for the exception to apply, the document must be "plainly visible without

touching it". D&O, p.15. "[T]he distinction between looking at a suspicious object in plain view and

moving it even a few inches is much more than trivial for purposes of the Fourth Amendment."

Arizona v. Hicks, 480 U.S. 321, 325 (1987). *See also* United States v. Mitan, 2009 WL 2195321,

*17 (E.D.Pa. 2009) ("Strosnider testified that he moved some of the documents around to further

identify them; moving documents around also supports the conclusion that their incriminating

nature was not immediately apparent.  As such, the Government's plain view argument fails").

I recognize that, given the number of documents seized from the kitchen of the

apartment, it may have been burdensome for the government to prove that the requirements of the

plain view exception had been satisfied as to each document. However, that does not excuse its

failure to do so.


2.      **Items Seized from the Living Room**

In the context of the investigation, the items seized from the apartment's living room

(cash, photos of sneakers, and money counting machine) may have been indicative of criminal

activity, although each also had a potentially innocent explanation. Nevertheless, I am not persuaded

by a preponderance of the evidence that these items were observed under circumstances entitling the government to invoke the plain view exception.

### a. Cash

I am unconvinced by the government's explanation of how the cash was discovered in the drawer of the living room table. Agent Hurwitz testified that while he was in the back room with defendant Lin, agents told him that they took defendant Hu into the living room, and that before seating her on the couch they opened the drawer of the coffee table as a security measure and observed cash in the drawer. [507], pp.98-100. However, as stated previously (pp.8-9, *infra*) I find that defendant Hu was never taken to the living room, and I therefore reject this explanation.

### b. Photographs of Sneakers

Agent Hurwitz testified that "*after* the arrest of Mr. Lin and Miss Hu, *after* they got dressed", he and the other agents walked through the apartment and "observed documents, photographs, and evidence of counterfeiting and trafficking in counterfeit merchandise, both in the living room and the kitchen". [507], pp.26-27 (emphasis added). The government itself admits that a "sweep must last[ ] no longer than is necessary to dispel the reasonable suspicion of danger *and in any event no longer than it takes to complete the arrest and depart the premises*". Government's post-hearing brief [567], p.32, n.47 (emphasis in original). Since agent Hurwitz admitted that there was no reason to delay removing defendants from the apartment until their son left for school ([507], p.105), he and the other agents had no basis for making these observations at that time.

### c.  Money Counting Machine

The same concerns stated above leave me in doubt as to when and how the money counting machine was discovered. Moreover, defendants' son, Jiaji Lin, testified that on the evening before the arrest, the machine was in a box with the lid closed. [481], p.124. The government could not explain what had become of the box ([507], pp.41-42), nor could agent Hurwitz explain why the box was photographed in a different location than where he claimed to have found it ([481], pp.58-59).

For all of these reasons, together with my general disbelief of the testimony of the government witnesses, I conclude that the government has failed to prove, by "the greater part of the believable and reliable evidence" (Parra, 2010 WL 2612679, *3), that the materials observed in and/or seized from the apartment on September 12, 2007 fall within the parameters of the plain view exception to the warrant requirement.


### C.  Search Warrant/Inevitable Discovery

The question of whether the search warrant obtained on September 13, 2007 validates the seizure of the evidence on September 12, 2007 has already been fully addressed in my previous Report and Recommendation ([587], pp.14-17).


### D.  Do the Benefits of Deterrence Outweigh the Costs of Excluding the Evidence?

In remanding the motions to me, Judge Arcara directed that I  "should also conduct the risk/benefit analysis (i.e., whether 'the benefits of deterrence ... outweigh the [societal] costs' of the exclusionary rule) articulated by the Second Circuit in United States v. Julius, 610 F.3d 60 (2d

Cir.2010), and the Supreme Court in <u>Herring v. United States</u>, 555 U.S.135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009)". D&O, pp. 18-19.

"The principal cost of applying the [exclusionary] rule is, of course, letting guilty and possibly dangerous defendants go free." <u>Herring</u>, 129 S.Ct. at 701. Defendants argue that "[n]o one is 'going free' as a result of the suppression of the evidence", because "[t]he government has wiretapped conversations and a parade of cooperating defendants". Defendants' joint supplemental memorandum [688], pp.17-18). This argument strikes me as curious - for if the evidence is of little value to the government's case, then where is the "sting" (*i.e.*, the deterrent value) of suppressing it? Nevertheless, the fact that the government is opposing the suppression motion justifies the inference that suppression of the evidence would increase the likelihood that defendants, even if actually guilty, would go free.

Accordingly, my analysis must "hinge[ ] on the culpability of the law enforcement officers . . . . That is, whether suppression is appropriate will turn upon whether, and if so to what degree, the officers acted improperly under the circumstances". D&O, p.19. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct." <u>Herring</u>, 129 S.Ct. at 702.

The fact that the September 12, 2007 search was "warrantless . . . entails different concerns about deterrence of police misconduct" than were present in <u>Herring</u>. <u>Julius</u>, 610 F.3d at 67. Therefore, I must "consider whether the other circumstances of the search support a finding that

the law enforcement officers had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment, requiring suppression." Id.

There can be no question that the agents either knew or should have known the requirements for a proper plain view seizure. Those requirements have long been well settled (*see* Dickerson, 508 U.S. at 375 and cases cited therein), and "[p]olice officers are presumed to know the law governing their conduct". Pritzker v. City of Hudson 26 F. Supp.2d 433, 443 (N.D.N.Y. 1998). Contrary to the government's position, this was not a good faith mistake by the agents. If it were, one would at least expect their versions of events to be basically consistent, and they were not. I fully concur in Judge Arcara's assessment that "it is not clear from the record what the officers saw and when they saw it" (D&O, p.18).What *is* clear, however, is that the agents made little effort to restrict their search and seizure to the proper confines of a plain view search. Instead, and particularly in the kitchen, they basically "made a clean sweep of every paper they could find" (Herring, 129 S.Ct at 702).

While there will doubtless be close cases under the Herring and Julius analysis, this is not one of them. If the Fourth Amendment is to have any meaning, the events of September 12-13, 2007 cannot be countenanced.

**CONCLUSION**

For these reasons, I again recommend that the motions for suppression [225, 247] be granted. Unless otherwise ordered by Judge Arcara, any objections to this Supplemental Report and Recommendation must be filed with the clerk of this court by February 7, 2011 (applying the time frames set forth in Fed. R. Crim. P. 45(a)(1)(C), 45(c), and 59(b)(2)).  Any requests for extension of

this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York ("Local Rules"), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority", and pursuant to Local Rule 58.2(a)(4), the objections must include "a written statement either (1) certifying that the objections do not raise new legal/factual arguments, or (2) identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

**SO ORDERED.**

Dated: January 21, 2011

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge